Filed 3/17/21  P. v. Esqueda CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>STEVEN PATRICK ESQUEDA,<br><br>　　Defendant and Appellant. | E072413<br><br>(Super.Ct.No. RIF1602054)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Samah Shouka, Judge.

Affirmed.

Paul J. Katz, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Natasha Cortina and Melissa A. Mandel, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found that defendant and appellant Steven Patrick Esqueda sexually abused his stepdaughter.  In this appeal, he contends that instructional error requires reversal of

1

the judgment against him. Specifically, he argues that the trial court had a sua sponte

duty to give a limiting instruction regarding expert testimony on Child Sexual Abuse

Accommodation Syndrome (CSAAS evidence), which it did not do.[1] In addition,

Esqueda argues that there was no substantial evidence of duress, as required to support

his convictions on two aggravated sexual assault charges.

We affirm the judgment. Any arguable instructional error was harmless, and the

record includes substantial evidence of duress.

## I. BACKGROUND

The prosecution presented evidence that Esqueda sexually molested his

stepdaughter for years, from when she was about eight years old until she was about 12

years old. Esqueda, who testified in his own defense at trial, denied ever touching her

inappropriately.

The jury found Esqueda guilty as charged, convicting him of sexual intercourse

with a person 10 years of age or younger (Pen. Code[2], § 288.7, subd. (a), counts 1 and 2),

oral copulation or sexual penetration of a person 10 years of age or younger (§ 288.7,

subd. (b), count 3), rape of a child under 14 years of age (§ 269, subd. (a)(1), count 4),

forcible oral copulation of a child under 14 years of age (§ 269, subd. (a)(4), count 5) and

---

[1]  In a petition for writ relief that we have considered together with this appeal, Esqueda asserts a claim of ineffective assistance of counsel based on his trial counsel's failure to request such an instruction or otherwise request that the expert's testimony be admitted only for a limited purpose. (Case No. E074991.) We rule on that petition by separate order.

[2]  Further undesignated statutory references are to the Penal Code.

committing a lewd act on a child under 14 years of age (§ 288, subd. (a), counts 6 and 7). The trial court sentenced him to a total of 103 years to life in prison, consisting of consecutive terms of 25 years to life for count 1, 25 years to life for count 2, 15 years to life for count 3, 15 years to life for count 4, 15 years to life for count 5, six years for count 6, and two years for count 7.

## II. DISCUSSION

A. *Instructional Error.*

Esqueda contends that the trial court erred by failing to give a limiting instruction regarding CSAAS evidence. On this record, we find any arguable error to be harmless.

1. *Additional Background*

In addition to various case-specific evidence, the prosecution introduced expert testimony from a clinical and forensic psychologist, Dr. Veronica Thomas. Thomas had "no knowledge" about the facts of this case—she did not conduct any interviews with the victim or other people involved, and she had not even been informed of the age or sex of the victim—but rather offered "generic" testimony about child abuse victims "as a class." She testified that there had been "a great deal of professional social science and psychological research about alleged victims of . . . sexual criminal conduct and perpetrators of the same conduct." This research, according to Thomas, includes "research that informs examiners and interviewers with regard to how victims respond to being assaulted," both when offenders and victims know one another and when they do not. The research has showed that, contrary to the "common belief 25 and 30 years ago"

3

that "children were molested only by strangers," 85 percent of the time victims know the person who molested them.

Thomas's testimony included discussion of the emotional dynamics that commonly occur when child victims are molested by someone they know and trust. She noted that often the abuse "isn't physically violent or painful," but rather is "more about an ongoing series of intrusive boundary violations that are confusing to a minor and psychologically upsetting and beyond their capacity to put into appropriate context." She discussed the concept of "compartmentalization," which she defined as the natural tendency to "put negative behavior into some sort of perspective," as a way of coping with a situation that the child "can't escape." She defined "grooming" in this context to mean "a series of behavior[s] that a child molester engages in that are aimed at helping a child feel more and more safe and comfortable with that person," that "[e]ventually . . . turns into sexual behavior of some sort."

Thomas further testified that child molestation victims often do not report their abusers: "Over 75 percent never tell anybody anything. And, in fact, when they do, if they do, it's usually going to be many, many years later . . . ." Sometimes, very young victims may not recognize that the touching by someone they "know and like and very well may have great affection for" is abuse until they are older. Thomas described disclosure, when it happens, as a "process" that "depending upon the age and the developmental level of the person we're talking about . . . can happen and unfold in a variety of ways." Thomas emphasized that it was important that child victims be told that

4

neither the abuse itself, nor any delay in saying something about it, was their fault: "If the child gets a positive response and isn't ashamed or made to feel like it was their fault, they are likely to continue to talk about their experience." She stated that disclosure is generally "incremental," and it is "very typical that children will recall things over time." It is also typical for the victims to have a better memory of "core" details—for example, "the nature of the behavior that was done to them"—than "peripheral" details such as "who else was there or how old they were at the time."

On cross examination, the defense asked Thomas to "tell the jury a little bit about the beginnings" of "CSAAS." Thomas explained that the term refers to a "therapy technique" called "Child Sex Abuse Accommodation Syndrome." It was first outlined in 1983 by a psychiatrist, Roland Summit, and his colleagues, who were working on treating female victims of father/daughter incest. CSAAS was not developed from a controlled study, but rather anecdotal evidence of comparing treatment notes. Summit and his colleagues observed "five areas about the sexual abuse between a father and a daughter that made it kind of unusual." Thomas was not asked to elaborate on what those five areas were.

Thomas noted that, despite its name, CSAAS is not a syndrome in the sense of being a diagnosable disorder, and it was "never meant" as diagnostic tool to determine whether a particular claim of sexual abuse is true or false. Rather, it is "a treatment avenue for people who may have been molested by somebody that they know." Thomas agreed that CSAAS, as developed by Summit, did not purport to be a "clinical method"

5

to separate out "valid claims" of sexual abuse from "invalid claims." With reference to her own work, Thomas similarly distinguished even very detailed discussions with clients conducted as part of treatment from interviews for law enforcement purposes: "It's not about whether or not something happened," but rather "about understanding that person's experience."

Thomas described her testimony as "a little bit different" from CSAAS, in that she was testifying more "about how victims of sexual abuse tend to disclose." She identified the central insight of CSAAS—the "major gift of Dr. Summit"— to be "that when people are molested by somebody they know, there are certain ways in which they may respond." Her own testimony, however, as she emphasized on redirect examination, was based on her experiences as a practitioner in the field of psychology, informed by scientific research "with regard to people who have those experiences of being molested by someone they know and how they may disclose," rather than an application of CSAAS per se.

2. *Analysis*

Expert testimony regarding CSAAS "'is inadmissible to prove that a child has been abused.'" (*People v. Mateo* (2016) 243 Cal.App.4th 1063, 1069.) Such testimony is admissible, however, "for the limited purpose of disabusing the jury of misconceptions as to how child victims react to abuse." (*People v. Bowker* (1988) 203 Cal.App.3d 385,

6

392.) These principles are sufficiently well established to have their own pattern jury instruction, CALCRIM No. 1193.[3]

Here, Thomas's opinions on direct examination were not expressly based on application of the CSAAS theory as it was originally articulated. Nevertheless, Thomas's testimony that child sexual abuse victims often delay disclosure is consistent with one of the central observations by Summit and his colleagues. (See *People v. Bowker*, *supra*, 203 Cal.App.3d at p. 389 [five "stages" of CSAAS include delayed disclosure].) More generally, Thomas's testimony addressed how child victims often react to sexual abuse by someone they know, based on the scientific research and her own experience in the field. It was, no doubt, informed by what she took to be the fundamental insight of CSAAS theory, namely, that there are observable patterns to the way victims often respond to abuse. Thus, even if, as the People argue, authority regarding CSAAS evidence as more strictly defined does not necessarily control our analysis here, we do find it applicable in a broader sense, as authority addressing analogous evidentiary and instructional issues.

---

[3] CALCRIM No. 1193 states: "You have heard testimony from _____ <*insert name of expert*> regarding child sexual abuse accommodation syndrome. [¶] _____'s <*insert name of expert*> testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against (him/her) [or any conduct or crime[s] with which (he/she) was not charged].[¶] You may consider this evidence only in deciding whether or not _____'s <*insert name of alleged victim of abuse*> conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of (his/her) testimony."

There is a split of opinion as to whether a trial court has a sua sponte duty to give a limiting instruction regarding CSAAS evidence when such evidence is presented. Most courts to have considered the issue have concluded that there is no sua sponte duty to give CALCRIM No. 1193 or an analogous limiting instruction. (See, e.g., *People v. Mateo*, *supra*, 243 Cal.App.4th at pp.1073-1074; *People v. Sanchez* (1989) 208 Cal.App.3d 721, 736; *People v. Stark* (1989) 213 Cal.App.3d 107, 116.) One case, however, has held that in all cases in which an expert testifies regarding CSAAS, the court must instruct sua sponte about its limited admissibility and how the jury should evaluate it. (*People v. Housley* (1992) 6 Cal.App.4th 947, 958-959.)

Here, however, we need not take sides in this disagreement among the courts of appeal. On our record, even if the court had a sua sponte duty to instruct using CALCRIM No. 1193 or an equivalent limiting instruction, the absence of that instruction was harmless error. The applicable standard is the one set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836, requiring reversal only if the defendant establishes a reasonable probability of a more favorable verdict if a limiting instruction had been given. (*People v. Mateo*, *supra*, 243 Cal.App.4th at p. 1074; *People v. Bowker*, *supra*, 203 Cal.App.3d at p. 395.) For the reasons discussed below, Esqueda has not made such a showing.

First, Thomas's testimony was not reasonably susceptible to interpretation in the impermissible manner, that is, as evidence that Esqueda committed any of the crimes charged against him. Thomas expressly disclaimed any knowledge of this case, and

8

emphasized that she spoke only about her knowledge of sexual abuse victims "as a class," based on her training and experience. She acknowledged that CSAAS is not properly used as a diagnostic tool to determine the validity of claims of abuse, and also that her own work in treating clients was "not about whether or not something happened." We see no reason to suspect that the jury disregarded these disclaimers and used Thomas's testimony as direct evidence that Esqueda was guilty—as distinguished from the permissible uses, outlined in CALCRIM No. 1193, of deciding whether the victim's conduct was "not inconsistent with the conduct of someone who has been molested" and in evaluating the believability of her testimony.

Second, the evidence against Esqueda was strong. The victim, a month shy of 15 years old at the time of trial, testified at length and in detail about the alleged sexual abuse, as well as her relationship with Esqueda more generally. Evidence of the victim's forensic interview, conducted when she was 12 years old and observed by police investigators, was also introduced. The victim's mother also testified; she described witnessing Esqueda touching the victim inappropriately on several occasions, and she was the first person to whom the victim disclosed the abuse.

To be sure, the defense had reasonable arguments to make. Among other things, the prosecution's physical evidence was limited, of debatable probative value, and portions were affirmatively disputed by a defense expert.[4] Esqueda also testified in his

_____

[4] The prosecution's DNA expert opined that a pair of the victim's underwear, recovered from Esqueda's residence, had male DNA on it consistent with Esqueda's reference sample in an amount indicative of "touch DNA" or a degraded sample from

*[footnote continued on next page]*

9

own defense, denying that he ever touched the victim inappropriately. The jury could have chosen to believe him, and to accept his proposed reasons why the victim and her mother might have made up the allegations.[5] But we do not see that the instruction at issue here relates in a significant manner to the defense arguments at issue in this case. Having reviewed the record, we find no reasonable probability that an express instruction on the limited appropriate uses of Thomas's testimony would have changed the weight the jury allotted to any of the evidence.

Esqueda proposes that certain comments during the prosecution's closing arguments increased the likelihood the jury used Thomas's testimony for improper purposes, since CALCRIM No. 1193 was not given to expressly instruct it on the proper uses of that evidence. We are not persuaded. For the most part, the prosecutor's discussion of Thomas's testimony was well within the boundaries described in CALCRIM No. 1193. The discussion was appropriately framed in terms of whether the victim's conduct was consistent with the typical conduct of someone who had been

---

sources with a higher amount of DNA in them than touch, such as saliva or semen. The defense's DNA expert disputed that analysis, finding the results consistent with environmental DNA. Other physical evidence introduced by the prosecution included a jar of sexual lubricant recovered by police from Esqueda's bathroom, which the victim said he sometimes used when molesting her. A forensic exam of the victim did not reveal any physical signs of sexual abuse, but that was consistent with the victim's report that it had then been two weeks since the last time Esqueda had sexual intercourse with her.

[5] Esqueda testified that the victim and her mother made up the allegations because he was, in their view, too "strict" with the victim and "regimented" about upkeep of their house. He had also previously told police that the victim's mother was "jealous" of his relationship with the victim, though he backed away from that statement at trial.

10

molested, as described by Thomas:  "I mean, when Dr. Thomas was testifying, it was as if she was talking about [the victim], except she had no idea what this case was about, she had no idea if this was a boy or a woman or a child or a girl, none of that, and as if it was by the book she was talking about [the victim]."

The prosecutor did make one comment regarding Thomas's testimony that merits closer examination.  In a discussion of things that the prosecutor urged the jury to view as "corroboration" of the victim's testimony, the prosecutor identified the victim's mother's testimony; the victim's "knowledge of the sexual act, that no 12-year-old should know"; the sexual lubricant found by police in Esqueda's bathroom, as well as the victim's reaction on the stand when she was shown a picture of it; the DNA evidence recovered from the victim's underwear; and certain aspects of Esqueda's statements to police and testimony.  The prosecutor also remarked, however, that "Dr. Thomas's testimony . . . is corroboration."

This last remark is, when taken in isolation, concerning because Thomas's testimony was not properly considered as "corroboration," if that term is understood to mean direct evidence from a source other than the victim that the alleged abuse occurred. (See *People v. Housley*, *supra*, 6 Cal.App.4th at p. 958 [testimony from an expert that a victim's behavior was typical of abuse victims "easily could be misconstrued by the jury as corroboration for the victim's claims," and should not be used as "proof of the molestation"].)  In context, however, it is apparent that the prosecutor did not use the term "corroboration" in that sense.  Rather, the term was used to refer to reasons that the

11

jury should, as the prosecutor put it, find that the victim was "honest" and "telling [the jury] the truth" in her testimony—in other words, that she was believable. As discussed, that is a use of Thomas's testimony that would have been expressly allowed by CALCRIM No. 1193, if it had been given. We find no basis in the record to conclude there is a reasonable likelihood the jury understood or applied the prosecutor's comment in any other manner. (See *People v. Centeno* (2014) 60 Cal.4th 659, 667 [when considering a defendant's attack on the prosecutor's remarks to the jury, we """"do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements'"].)

Because Esqueda has failed to demonstrate prejudice from any arguable instructional error, reversal is not required.

B. *Duress*

Esqueda's aggravated sexual assault convictions (counts 4 and 5) require proof that "force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person" was used to accomplish the crime. (§§ 261, subd. (a)(2), 287, subd. (c)(2)(B); see also § 269, subd. (a)(1) & (4).) At trial, the prosecution argued that duress was the prong of this requirement that "applies in this case," and the jury's instructions were tailored accordingly. Here, Esqueda contends there was no substantial evidence of duress to support his convictions on these counts. We are not persuaded.

When, as here, we review the record for substantial evidence, we "determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any

12

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*People v. Edwards* (2013) 57 Cal.4th 658, 715.) We "'presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" (*Ibid.*) Reversal for insufficient evidence "'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

In the context of sexual offenses, duress means a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a person of ordinary susceptibilities to (1) perform an act that the person otherwise would not perform or, (2) acquiesce in an act that the person otherwise would not submit. (*People v. Leal* (2004) 33 Cal.4th 999, 1004-1005.) "Physical control can create 'duress' without constituting 'force.'" (*People v. Senior* (1992) 3 Cal.App.4th 765, 775.) In determining whether duress was used, the trier of fact must consider the totality of the circumstances, including the victim's age and relationship to the defendant. (*People v. Cochran* (2002) 103 Cal.App.4th 8, 13-14, overruled on other grounds in *People v. Soto* (2011) 51 Cal.4th 229, 248, fn. 12.) "Other relevant factors include threats to harm the victim, physically controlling the victim when the victim attempts to resist, and warnings to the victim that revealing the molestation would result in jeopardizing the family." (*Cochran*, *supra*, 103 Cal.App.4th at p. 14.) "[A]s a factual matter," when the victim is particularly young and is molested by a parent in the family home, "in all but the rarest cases duress will be present." (*Id.* at p. 16, fn. 6 [involving nine-year-old victim].)

13

Here, there was ample evidence from which the jury could reasonably deduce that Esqueda used duress to accomplish the charged sexual assaults. Esqueda first moved in with the victim and her mother when she was about four years old, and married her mother about two years later. The prosecution presented evidence that he frequently sexually abused the victim beginning when she was about eight years old, and continuing until she was 12 years old. The victim's age and relationship to Esqueda therefore weigh strongly in favor of a finding of duress.

Other relevant factors also weigh in support of a finding of duress. The victim testified that Esqueda would tell her regarding the sexual abuse: "Don't tell anyone or else." When the victim failed to clean her room or otherwise behave to Esqueda's satisfaction, the punishments he would employ included corporal punishment (spanking). Esqueda often would yell and curse at the victim's mother when he became angry, which he often did, and there was evidence that on one occasion he threatened the victim's mother with a knife in the victim's presence. The victim testified that during sexual abuse, Esqueda "made" her perform certain actions and say certain things, and that she was scared he would hurt her if she disobeyed. The jury reasonably concluded that, given the totality of the circumstances, a person of normal susceptibilities would perceive and be coerced by Esqueda's direct and implied threats.

Esqueda's arguments in support of a contrary conclusion rest on comparison of this case to other cases with different facts, and characterizations of the evidence that are not in the light most favorable to the prosecution. Given the applicable standard of

14

review, they do not merit detailed discussion. It is worth noting here, however, that we wholly agree with those authorities that have held that warning a child not to report molestation also reasonably implies that the child "should not otherwise protest or resist the sexual imposition," and weighs in support of a finding of duress. (*People v. Senior*, *supra*, 3 Cal.App.4th 765, 775 [disagreeing with *People v. Hecker* (1990) 219 Cal.App.3d 1238, 1251, fn. 7 and *People v. Bergschneider* (1989) 211 Cal.App.3d 144, 154, fn. 8].)

In short, the jury's finding of duress was supported by substantial evidence, so we will not disturb it.

### III.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL
J.

We concur:

RAMIREZ
P. J.

MENETREZ
J.